**TRANS–WESTERN EXPRESS, LTD., Petitioner–Appellant,**

v.

**The PUBLIC UTILITIES COMMISSION of the STATE of Colorado, Respondent–Appellee.**

**No. 93SA271.**

Supreme Court of Colorado, En Banc.

July 11, 1994.

Jones & Keller, P.C., Edward T. Lyons, Jr., David E. Driggers, Denver, for petitioner-appellant.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Merrill Shields, Deputy Atty. Gen., Richard Djokic, First Atty. Gen., Jeffery A. Froeschle, Asst. Atty. Gen., Denver, for respondent-appellee.

Justice ERICKSON delivered the Opinion of the Court.

Trans–Western Express, Ltd. (TWX) appeals the decision of the district court which upheld the ruling of the Public Utilities Commission of Colorado (PUC).[1] The PUC denied TWX's application for extension of its common-carrier authority. TWX asserts that the PUC applied the wrong standard of "public need" by finding that the testimony of a single shipper does not establish the requisite public need to amend a common-carrier's certificate of public convenience and necessity. TWX also claims that the decision of the PUC was arbitrary and capricious, internally and externally inconsistent, and

---

1. TWX appeals to this court pursuant to § 40–6–115(5), 17 C.R.S. (1993) ("Appellate review may be obtained in the supreme court concerning any final judgment of the district court on review, affirming, setting aside, or modifying any decision of the commission....").

without a rational basis in the record. We disagree and affirm the judgment of the district court.

## I

TWX is a common carrier of goods that provides trucking service within the State of Colorado. One of TWX's primary customers is Target Stores, Inc. (Target). TWX holds common-carrier authority pursuant to Certificate of Public Convenience and Necessity No. 205 & I (PUC No. 205) which allows TWX to operate between Target's Pueblo distribution center and Target's retail stores located within Colorado.[2] PUC No. 205 states:

I. Transportation—on schedule—of

    A. General Commodities

      . . . .

    6. Between the facilities owned or controlled by Target Stores, Incorporated, located within a ten-mile radius of the intersection of 5th and Main Streets, Pueblo, Colorado, and between said points on the one hand, and on the other hand, the facilities owned or controlled by Target Stores, Incorporated, located within the State of Colorado;

      . . . .

II. Transportation—on call and demand—of

      . . . .

    J. General Commodities

    Between the facilities owned or controlled by Target Stores, Inc., located within a ten-mile radius of the intersection of 5th and Main Streets, Pueblo, Colorado, and between said points on the one hand, and on the other hand, all points within the State of Colorado.

PUC No. 205 also contains restrictions that prohibit TWX from shipping to the counties served by other carriers. TWX sought to strike Restriction A which provides:

> RESTRICTIONS: This certificate is restricted as follows:
>
> (A) Items (I)(A)(6) and (II)(J) are restricted against providing service into or out of points in the Counties of Boulder, El Paso, Phillips, Logan, Morgan, or Sedgwick, State of Colorado.

Pursuant to common-carrier authority, Star Motor Freight Lines, Inc. (Star Motor) serves Target's Boulder County retail outlet; HVH Transportation, Inc. (HVH) serves Target's El Paso County retail distributor; and Platte Valley Freightways, Inc. (Platte Valley) has common-carrier authority in all other counties.[3] Thus, PUC No. 205 limits TWX's ability to serve all of Target's retail outlets in Colorado.

Prior to September 1991, Target decided to eliminate its use of multiple carriers. In order to improve its service and cut its costs, Target issued a request for proposals of all its common carriers for "just in time" transportation service. "Just in time" transportation service is service where carriers transport goods from a central warehouse to retail outlets as they are needed. Target sought the proposals to find a carrier that would provide an exclusive, specialized, and dedicated transportation service, moving all of Target's commodities from its Pueblo distribution center to all eighteen Target retail outlets in the State of Colorado early each morning, just as the commodities are needed, thereby eliminating the need for the retail outlets to maintain costly inventory.[4] Target asserts that the reduced costs would be passed along to the customer in the form of lower prices. In order to achieve the desired results of "just in time" service, a ninety-nine percent on-time delivery rate was required and, at the time Target sought a carrier to provide this specialized service, all the carri-

---

2. Common carrier is defined as:
    "Common carrier" means every person directly or indirectly affording a means of transportation, or any service or facility in connection therewith, within this state by railroad, motor vehicle, aircraft, or other vehicle whatever by indiscriminately accepting and carrying for compensation passengers or property. . . .
    § 40–1–102(3), 17 C.R.S. (1993).

3. Currently, of the counties that TWX does not serve, Target has retail outlets only in Boulder and El Paso counties.

4. One of Target's main competitors, Wal–Mart Stores, Inc., utilizes "just in time" transportation service. Target viewed the need to utilize similar service as a requisite for remaining competitive.

ers had achieved better than ninety-nine percent on-time delivery.

On September 30, 1991, TWX filed an application seeking authorization to extend its operations under PUC No. 205 by removing Restriction A, which prohibits TWX from providing service into or out of Boulder, El Paso and other counties currently served by other carriers. After the PUC published notice of the application, HVH, Platte Valley, and Star Motor filed a joint notice of intervention as a matter of right.[5]

On March 10 and 11, 1992, a hearing was held before an administrative law judge (ALJ) to consider whether the PUC should grant TWX's application to remove Restriction A. The ALJ found that TWX did not establish the requisite public need for the proposed service and therefore recommended that the PUC enter an order denying TWX's application. Specifically, the ALJ found that the existing carriers serving Boulder and El Paso counties were providing adequate service and that while Target "presented evidence of its preference for a tailored, dedicated, and specialized 'just in time' transportation service ... no evidence of the broader public need" was offered.

TWX filed exceptions to the ALJ's recommended decision on October 13, 1992, and HVH, Platte Valley, and Star Motor responded to the exceptions. The PUC denied TWX's exceptions and affirmed the recommended decision of the ALJ. Subsequently, TWX filed a petition in the district court to review the decision of the PUC. After the parties filed briefs and the court heard oral arguments, the district court entered an order affirming the PUC's decision that TWX had not demonstrated a public need to remove Restriction A.

**5.** Miller Brothers, Inc. also filed a notice of intervention as a matter of right but subsequently withdrew its motion to intervene.

**6.** The regulated monopoly doctrine, which is still applicable to common carriers of passengers, was replaced by the General Assembly as the controlling theory governing intrastate trucking in 1967. Ch. 433, § 115–9–5(2), 1967 Colo.Sess. Laws 974.

## II

TWX contends that the ALJ, the PUC, and the district court applied the wrong standard for determining public need in this case, that an improper new rule of evidence was arbitrarily established, and that the PUC's decision was not supported by the record. We disagree.

## A

■ Common-carrier certificates of public convenience and necessity are governed by the doctrine of "regulated competition" pursuant to section 40–10–105(2), 17 C.R.S. (1993).[6] *See D & G Sanitation, Inc. v. Public Util. Comm'n,* 185 Colo. 386, 388, 525 P.2d 455, 456 (1974) (applying the doctrine of "regulated competition"); *Miller Bros., Inc. v. Public Util. Comm'n,* 185 Colo. 414, 430, 525 P.2d 443, 451 (1974) (same); *Red Ball Motor Freight, Inc. v. Public Util. Comm'n,* 185 Colo. 438, 441, 525 P.2d 439, 440 (1974) (same). The doctrine of regulated competition requires the PUC to deny an application for common-carrier authority if granting the application would create "excessive" or "destructive" competition.[7] *See Morey v. Public Util. Comm'n,* 629 P.2d 1061, 1066, 1068 n. 9 (Colo.1981) *(Morey II )*. "Under the doctrine of 'regulated competition,' the controlling consideration is the *public need." Morey v. Public Util. Comm'n,* 196 Colo. 153, 156, 582 P.2d 685, 687 (1978) *(Morey I )* (emphasis in original).

Section 40–10–105(2) sets forth the controlling statutory language for granting common-carrier authority and provides:

The granting of any certificate of public convenience and necessity to operate a motor vehicle for hire for the transportation of property shall not be deemed to be an exclusive grant or monopoly, and the doc-

**7.** Providing for the public need and regulating competition demands that some restraints be placed upon inter-carrier competition therefore avoiding destructive competition. *Morey v. Public Util. Comm'n,* 629 P.2d 1061, 1066 (Colo. 1981) *(Morey II )*. "The obligation to safeguard the general public against the impaired services and/or higher rates accompanying destructive or excessive competition is at the heart of regulated competition." *Id.*

trine of regulated competition shall prevail. The commission has authority to grant more than one certificate of public convenience and necessity to operate motor vehicles for the transportation of property over the same route or a part thereof or within the same territory or a part thereof *if the commission finds that the present or future public convenience and necessity requires or will require such operation.*

(Emphasis added.) Thus, under the regulated competition standard applicable to common-carrier authorities, the PUC may grant more than one common-carrier authority on a route if it finds public need for the authority. § 40–10–105(2), 17 C.R.S. (1993).

■ The award of common-carrier authority is a legislative prerogative granted to the PUC by the Colorado Constitution and by the General Assembly.[8] Colo. Const. art. XXV; §§ 40–10–104 & 40–10–105(2), 17 C.R.S. (1993); *Morey II*, 629 P.2d at 1065. We are not precluded, however, from reviewing the guidelines promulgated and applied by the PUC to ensure that they are not unconstitutional, arbitrary, capricious, unreasonable or vague. *Morey II*, 629 P.2d at 1065; *Miller Bros.*, 185 Colo. at 435, 525 P.2d at 454.

■ We have held that the public interest or the public need is served by safe, efficient, and economical transportation services. *Morey II*, 629 P.2d at 1066; *see also Wells Fargo Armored Serv. Corp. v. Public Util. Comm'n*, 190 Colo. 204, 207, 545 P.2d 707, 709 (1976) (affirming the reasoning of *Miller Brothers*); *Miller Bros.*, 185 Colo. at 434–35, 525 P.2d at 453–54 (approving a set of standards set forth by the PUC which examined efficiency, economics, sufficiency, and safety when determining public need). One factor the PUC may consider in determining whether there is a public need for common-carrier authority pursuant to the tenets of the doctrine of regulated competition is the adequacy or inadequacy of current service. *Morey*

*I*, 196 Colo. at 156, 582 P.2d at 687. Another consideration we have held relevant is whether the needs of the public as a whole are served.

In *Morey II*, we held that the public need is broader than the individual needs and preferences of an applicant's customers. *Morey II*, 629 P.2d at 1066–67. In upholding the denial of an application based solely on the needs and preferences of the applicant's customers, we concluded:

That [the customer's] needs and preferences are probative of a "public need" for competitive services is indisputable. They are not, however, conclusive evidence of a "public need." ... If certificates of public convenience and necessity were made available, as a matter of right, to any applicant who could prove that one or more customers needed or preferred its proposed services, the statutory mandate to *regulate* competition would be illusory. "Regulated competition" is not synonymous with deregulation.

*Id.* at 1066 (emphasis in original).

■ Thus, *Morey II* defines public need as "the needs of the public as a whole, not simply the needs of witnesses who testify in favor of an applicant's proposed service." *Id.* at 1067. While the needs and preferences of one shipper may be some evidence of public need, they are neither necessarily dispositive nor immaterial. Therefore, the PUC may consider testimony of a single shipper concerning public need, weigh the testimony, and determine its significance.

**B**

■ In determining whether TWX demonstrated a public need for removing Restriction A, the ALJ and the PUC did not announce a new evidentiary standard that would foreclose the testimony of a single shipper, as a matter of law, from establishing public need. Contrary to TWX's contention, the PUC merely found a lack of support for

---

**8.** In *Miller Bros., Inc. v. Public Util. Comm'n*, 185 Colo. 414, 435, 525 P.2d 443, 454 (1974) we said:

We are tempted to announce a set of guidelines, extracted from the statutes and decisions of other jurisdictions. This, however, lies sole-

ly within the province of the Commission. To repeat, the Commission is here acting in a legislative capacity. It needs to apply guidelines, and it is within our jurisdiction on appeal to see that it does.

TWX's assertion that there was a public need to grant its application.

In *Kuboske v. Public Util. Comm'n*, 187 Colo. 38, 528 P.2d 248 (1974), we reversed a PUC decision that an applicant's testimony alone could not establish public convenience and necessity. The PUC incorrectly stated that the absence of supporting testimony from customers was fatal to the application. We held that it was patently arbitrary and capricious for the PUC to base its ruling on the number of witness produced by an applicant and noted that substantial evidence required to show a need for a proposed extension of service may be met solely from the applicant's testimony. *Id.*, 187 Colo. at 39–40, 528 P.2d at 249.

■ Similarly, in *Public Utilities Commission v. Donahue*, 138 Colo. 492, 335 P.2d 285 (1959), we rejected as unlawful and unconstitutional a PUC rule precluding a finding of public convenience and necessity unless a shipper or passenger testified. We stated: "If the rule means that no application can be granted without passenger testimony, no matter how strong other proof might be, then such a rule would defeat the purpose of a trial and constitute a denial of due process." *Id.* at 138 Colo. 504, 335 P.2d at 291. The PUC may not "under the pretense of regulating evidence . . . establish rules of evidence which prevent a party from exhibiting his rights . . . by virtually excluding evidence in his behalf." *Id.*

The PUC in this case, however, has not established a new rule of evidence or excluded evidence. Although the ALJ found that TWX "failed to establish *any* public need for the service here requested," the PUC recognized this fact and noted that there was "some" evidence of a "possibility" of public need presented by TWX. The PUC then found that the evidence in the record supported the fact that the type of public need TWX presented was not dispositive. While the decision of the ALJ may not have been entirely clear, there was ample evidence in the record that supported the ALJ's conclusion. *See Miller Bros.*, 185 Colo. at 425, 525 P.2d at 448 (stating that the PUC decision

was not "a model of clarity" but evidence in the record supported its decision and the lack of clarity did not render the PUC decision infirm).

The PUC did not hold that evidence of broad public need could not come from the shipper or any other person. The PUC found that the testimony presented by Target concerning possible lower prices constituted evidence of public need: "That somewhat attenuated 'public need' is the *possibility* of lower prices to Target's customers if the allegedly more efficient service offered by TWX were granted may constitute *some* evidence of the public evidence of public benefit for the services." Nor did the PUC state that evidence from a shipper, without public support, could not meet the applicant's burden of proving public need. The district court recognized that the PUC and the ALJ determined that TWX did not present sufficient evidence of public need and stated:

> This finding is merely a statement of the sufficiency of the evidence, after consideration of weight to be given certain evidence, in this case. A close examination of the findings of the ALJ adopted by the PUC, shows that this finding is applicable to this particular case and is not a general statement imposing an arbitrary and capricious standard of proof in [a] hearing involving common-carrier certificate.

The PUC and the ALJ observed that there was not sufficient evidence from anyone on the issue of broad public need, as opposed to the private needs of Target.

> Great weight must be given to the interpretation which the Commission gives to its own language, and unless such interpretation is clearly erroneous, arbitrary or in excess of its jurisdiction, the courts may not interfere.

*Miller Bros.*, 185 Colo. at 427–28, 525 P.2d at 449 (quoting *McKenna v. Nigro*, 150 Colo. 335, 337, 372 P.2d 744, 745–45 (1962)). Accordingly, we hold that the PUC did not act in an arbitrary and capricious manner in finding TWX's proof of public need insufficient.[9]

---

9. TWX asserts that the decision of the ALJ and the PUC was arbitrary, capricious, and internally

and externally inconsistent. Because we hold that the ALJ and the PUC did not propound a

TWX's assertion that the PUC announced a new evidentiary standard that forecloses the testimony of single shipper to establish public need is erroneous. Therefore, the sole issue is whether substantial evidence in the record supports the ALJ's findings.

### C

The final issue before us is whether evidence in this case constitutes a public need.[10] The ALJ, the PUC, and the district court all held that by itself, evidence of Target's needs and preferences does not constitute a public need. We agree.

Findings and conclusions of the PUC are presumed to be reasonable and valid,[11] *Caldwell v. Public Util. Comm'n,* 200 Colo. 134, 137, 613 P.2d 328, 330 (1980), and we will not disturb them when they are supported by substantial evidence in the record. *Morey II,* 629 P.2d at 1068; *Sangre De Cristo Elec. Ass'n v. Public Util. Comm'n,* 185 Colo. 321, 324, 524 P.2d 309, 310 (1974). Evidence is reviewed in the light most favorable to the PUC's findings. *Peoples Natural Gas Div. of N. Natural Gas Co. v. Public Util. Comm'n,* 193 Colo. 421, 427, 567 P.2d 377, 381 (1977). Finally, considerable weight is given to findings of the PUC because of its expertise and judgment.

The PUC is required to balance conflicting inferences and weigh findings, *Colorado Mun. League v. Public Util. Comm'n,* 197 Colo. 106, 111, 591 P.2d 577, 580 (1979); *Atchison, Topeka & Santa Fe Ry. Co. v. Public Util. Comm'n,* 194 Colo. 263, 267, 572 P.2d 138, 141 (1977), and a reviewing court is prohibited from substituting its judgment for that of the PUC. *Public Serv. Co. v. Public Util. Comm'n,* 644 P.2d 933, 940 (Colo.1982); *North Eastern Motor Freight, Inc. v. Public Util. Comm'n,* 178 Colo. 433, 436, 498 P.2d 923, 924 (1972). The standard of review on a question of whether a decision of the PUC is supported by the evidence is whether the PUC's conclusions are in accordance with the evidence. *Ace West Trucking, Inc. v. Public Util. Comm'n,* 788 P.2d 755, 762 (Colo.1990).

In the hearing before the ALJ, TWX contended that the proposed "just in time" transportation service would result in substantial savings to Target, and Target would in turn, pass those savings along to the customer in the form of lower prices.[12] According to TWX, this was evidence of the public need.

The ALJ rejected this contention, however, stating:

> The public need in issue in this proceeding is the broad public need for transportation

---

new rule of evidence, that the PUC's decision to grant common-carrier authority is a legislative prerogative, and that the record supports the decision, *see infra* part II(C), we disagree with TWX's contentions.

**10.** TWX states the issue presented for review in this manner:

> Whether the rule of evidence that the PUC adopted in denying TWX's application, which foreclosed proof of need for a common-carrier service based on the testimony of a single shipper, was erroneous as a matter of law and violated TWX's rights to due process?

**11.** Additionally, the party challenging the validity of the order has the burden of proving that the PUC's order was improper. *Public Util. Comm'n v. Weicker Transp. Co.,* 102 Colo. 211, 217, 78 P.2d 633, 636 (1938).

**12.** The PUC notes that although TWX appears to be seeking authority more similar to a contract carrier authority to provide in-house, specialized transportation services, TWX's application is for

common-carrier authority. Under the contract carrier standard, the PUC considers the "specialized needs" of the shipper, and gives considerable deference to the shipper's choice of a carrier, even when there are competing common carriers. *See* § 40–11–103, 17 C.R.S. (1993); *Pollard Contracting Co. v. Public Util. Comm'n,* 644 P.2d 7, 11 (Colo.1982) (citing PUC Guideline C which discusses the importance of discerning a contract carrier applicant's ability to serve a specialized need). A contract carrier may not charge rates less than "the rates prescribed for motor vehicle common carriers for substantially the same or similar service." § 40–11–105(2), 17 C.R.S. (1993). Therefore, under a contract carrier application, TWX would be precluded from charging rates lower than those charged by the existing common carriers and Target could only benefit from lower transportation costs if the common-carrier authority were granted. Because TWX applied for a modification of its existing common carrier authority, we analyze the application under the common carrier standards and not the standards relevant to contract-carrier authority.

service, rather than Target's preference for a dedicated, tailored, specialized transportation service, which may provide transportation costs savings to Target. Accordingly, it is concluded that TWX has failed to establish any public need for the service here requested.

The PUC reviewed the ALJ's determination and agreed:

In this case, TWX did not present public witnesses, other than TWX and Target stating [ ] their private benefits for the proposed service. The administrative law judge may have overstated the matter when he found that TWX "failed to establish *any* public need for the service here requested." The somewhat attenuated "public need" is the *possibility* of lower prices to Target's customers if the allegedly more efficient service offered by TWX were granted may constitute *some* evidence of public benefit for the services....

Thus, while evidence of a benefit to the public from lower prices and a benefit to the shipper may be considered when determining if there is a public need for the granting of an application for a certificate of public convenience and necessity, the ALJ and the PUC did not find them dispositive.

The PUC applied the proper legal standard. It was within the PUC's authority to deny TWX's application. The ALJ took extensive testimony over the course of two days of hearings on the application. The record reveals that the only evidence of public need was Target's testimony. The PUC reviewed the ALJ's findings and stated, "[i]n recommending denial of the application, the dispositive factor for the administrative law judge was the lack of evidence from the public, as opposed to evidence merely from the shipper Target regarding its private needs, for the necessity of TWX's common carrier service."

The ALJ and the PUC did not determine that the "just in time" transportation service Target wanted TWX to provide would impact the public need by providing lower prices for Target's customers. Target claimed that it needed one shipper to provide efficient "just in time" transportation service to adequately meet the needs of Target's retail stores so that the retail stores would not be required

to stock inventory. Target reasoned that an efficient carrier could meet this need and could therefore save Target the cost of keeping inventory. To accomplish on-time delivery, Target indicated that it required a ninety-nine percent on-time delivery rate to satisfy its "just in time" delivery requirements.

The ALJ determined, however, that all the common carriers were currently providing transportation services at a *higher* percentage on-time delivery rate than Target's "just in time" delivery requirements. The adequacy, availability, and competitive character of existing service are proper factors to consider in concluding that TWX's service is not "required" to serve public convenience and necessity. *See Miller Bros.,* 185 Colo. at 434, 525 P.2d at 453 (approving the PUC's evaluation of the availability, adequacy, and competitive character of existing common-carrier service); *see also* § 40–10–105(2), 17 C.R.S. (1993) (stating that the PUC may grant certificates of public convenience and necessity to more than one carrier if the public need *"requires"* it). Because TWX could not provide more efficient service to Target as a single shipper than the other carriers, there would be no cost-savings to pass along to Target's customers. Therefore, the record supports the ALJ's finding that the claimed public need for lower prices would not be met by granting TWX's application.

The ALJ also considered the harm to the existing carriers when determining whether there was a public need to grant TWX's application. The ALJ found that HVH and Star Motor would lose "backhaul" traffic if the application were granted. Thus, under the doctrine of regulated competition, the ALJ properly considered the impact the additional competition might have on competing carriers and on the existing carrier's ability to provide safe and efficient transportation services to their customers and to the public generally. *See Miller Bros.,* 185 Colo. at 435, 525 P.2d at 452–53 (discussing the ramifications of an application that would materially impair the operations of existing carriers). The impact or harm to common carriers is relevant, however, only if it affects the general public, of which the carrier is a part.

Finally, the ALJ and the PUC considered the broad public need in removing Restriction A from PUC No. 205. The PUC noted the public benefits from HVH and Star Motor providing service to Target as backhaul freight. According to the PUC:

> HVH and Star [Motor's] backhauling of cargo from Target's Pueblo Distribution Center means that trucks are used to maximum capacity, and that energy is conserved and air pollution is minimized, a public benefit for not granting TWX a common carrier authority, because TWX, Star [Motor], and HVH would all apparently be empty on one part of their route to Pueblo if the application were granted.

Therefore, without more, the testimony that Target preferred the removal of Restriction A was not enough for the ALJ or the PUC to find a public need. The ALJ stated:

> In this proceeding, Target presented evidence of its preference for a tailored, dedicated, and specialized "just in time" transportation service. However, no evidence of the broader public need for the proposed service was here offered. TWX contends that the highly efficient "just in time" transportation service here proposed will result in substantial cost savings to Target, which savings will ultimately be passed on to Target's customers in the form of lower prices for retail goods. and that this equates with a public need for the service here proposed. This contention is rejected. The public need in issue in this proceeding is the broader public need for transportation service, rather than Target's preference for a dedicated, tailored, and specialized transportation service, which may provide transportation cost savings to Target.

Because the ruling of the PUC is supported by substantial evidence in the record, TWX did not establish a public need for an extension of its common-carrier authority.

### III

We hold that the PUC applied the correct standard of public need in denying TWX's application for extension of its common-carrier authority and that the decision of the PUC was not arbitrary or capricious, internally or externally inconsistent, and has a rational basis in the record. Accordingly, we affirm the judgment of the district court.

ROVIRA, C.J., dissents.

VOLLACK, J., joins in the dissent.

Chief Justice ROVIRA, dissenting.

The majority concludes that the Public Utilities Commission of Colorado (PUC) did not announce "a new evidentiary standard that forecloses the testimony of a single shipper to establish public need" and therefore, it reasons that "the sole issue is whether substantial evidence in the record supports the ALJ's findings." Maj. op. at 356. In so doing, the majority refuses to come to grips with Trans–Western Express, Ltd's (TWX) argument that the decisions of the ALJ and PUC are arbitrary and capricious. Maj. op. at 355 n. 9.

I agree with the majority that the PUC did not announce a new *evidentiary* standard to govern this case. I conclude, however, that the *legal* standard applied by the ALJ, the PUC, the district court, and the majority is fundamentally flawed. Applying the legal standard which is appropriate under the facts of this case leads unequivocally to the conclusion that TWX's application for expanded common-carrier certification should have been granted based on the evidence presented. Therefore, I dissent.

### I

There are four facts which are, in my opinion, all but dispositive of the issue presented: (1) TWX's common-carrier authority pursuant to Certificate of Public Convenience and Necessity No. 205 & I allows it to transport goods only for Target, and not for any other customer;[1] (2) the PUC adopted the finding of the ALJ that TWX's "application should not be denied because HVH and Star will most likely lose Target's backhaul traffic if this application is granted"; (3) the PUC

---

1. A common-carrier certificate which enables a carrier to transport the goods of only one shipper will be referred to as a "single-shipper certificate."

adopted the finding of the ALJ "that the public will not be subjected to destructive or excessive competition if this application is granted"; and, (4) Target has made the business judgment that securing a single, dedicated, statewide carrier capable of providing "just-in-time" delivery services is in its best interest.

## II

The legal doctrine governing when, and under what circumstances a common-carrier should be granted a certificate of public necessity and convenience is that of regulated competition. § 40–10–105(2), 17 C.R.S. (1984); *Miller Bros., Inc. v. Public Util. Comm'n,* 185 Colo. 414, 525 P.2d 443 (1974). Under that doctrine, the " 'public interest' or 'public need' is the paramount consideration governing the issuance or denial of a certificate of public convenience and necessity." *Morey v. Public Util. Comm'n,* 629 P.2d 1061, 1065 (Colo.1981). The ALJ, PUC, and majority all recognize that the central question here is whether TWX has met its burden of showing a "public need" for granting its application. The ALJ and PUC concluded that TWX failed to meet this burden because it offered only evidence of Target's "private need" for the application, as opposed to a broader public need for the requested certificate:

> Target presented evidence of its preference for a tailored, dedicated, and specialized "just in time" transportation service. However, no evidence of the broader public need for the proposed service was here offered.... *The public need in issue in this proceeding is the broad public need for transportation service,* rather than Target's preference for a dedicated, tailored, specialized transportation service, which may provide transportation costs savings to Target. (Emphasis added).

The majority affirms this conclusion on the grounds that the need of a single shipper, while relevant, need not be dispositive in assessing the public need. In support of that

conclusion, the majority relies on *Morey v. Public Util. Comm'n,* 196 Colo. 153, 582 P.2d 685 (Colo.1978) (*Morey I* ), and *Morey v. Public Util. Comm'n,* 629 P.2d 1061 (Colo. 1981) (*Morey II* ). In *Morey II,* we observed that our prior cases have never,

> suggested that "public need" under the doctrine of "regulated competition" is to be measured solely or exclusively by the needs or preferences of an applicant's customers. That their needs and preferences are probative of a "public need" for competitive services is indisputable. They are not, however, conclusive evidence of a "public need."

*Id.* at 1066. Rather, we noted that "the Commission may consider the impact additional competition may have, not only on the conflicting economic interests of competing carriers, but also on the ability of existing carriers to provide their customers and the public generally with safe, efficient and economical transportation services." *Id.*

While the majority is quite correct in concluding that *Morey II* stands for the general proposition that testimony of a single shipper need not be dispositive to a determination of "public need," that principle has no application under the facts of this case. The certificate at issue in *Morey I* and *Morey II,* would have enabled the carrier to transport commodities between Denver, Pueblo, and Lamar, Colorado to potentially thousands of customers. *Morey II,* 629 P.2d at 1062. As such, it made sense, both good and common, to conclude that among the thousands of potential customers who could be provided services if the certificate were granted, the testimony of a single customer regarding the individual benefits that would flow from granting the certificate should not be dispositive on the question of public need. In contrast, the sought after certificate here seeks only to provide expanded territorial service to Target. No other customers can be provided services by TWX if its application is granted.[2] Under such circumstances, Target

---

2. The PUC's conclusions regarding the scope of TWX's authority is clear: "although TWX's authority is a 'common carrier' authority, the authority pertains to only one customer, Target

Stores, Inc., for trucking only between Target's Pueblo Distribution Center and Target's retail outlets in Colorado."

is the public, and its needs are equivalent to the needs of the public.

Given that TWX's common-carrier certificate permits it to provide services only to Target, TWX is operating more like a contract-carrier than a common carrier. *See* Carl H. Fulda, *Competition in the Regulated Industries: Transportation* § 4.1, 70 (1961) (the principle feature of the distinction between a contract and a common carrier is the "general holding out to the public by the common carrier and the rendering of specialized services pursuant to contracts with one customer or a limited number of customers by the contract carrier"). TWX's status as a common-carrier, however, is not at issue in this proceeding. Moreover, substantial evidence was presented which indicates that the PUC regularly grants common-carrier status to carriers providing services to only one customer [3] and there is no indication that the PUC has or will in the future cease granting common-carrier certificates to single-shipper carriers.

Recognizing that TWX holds a valid common-carrier certificate although it is in fact operating more like a contract carrier than anything else, it is important to remember that with contract carriers, the PUC considers the "specialized needs" of the shipper, and gives considerable deference to the shipper's choice of a carrier, even when there are competing carriers. *See Pollard Contracting Co. v. Public Util. Comm'n*, 644 P.2d 7, 11 (Colo.1982); § 40–11–103, 17 C.R.S. (1993). Why is so much significance placed on the specialized needs of the shipper when certification as a contract carrier is sought, whereas a broader showing of public need is required for common carrier certification? The answer is obvious:

> [T]he contract carrier, whose authority is limited in nature, restricted to specific commodities, specific shippers and designed to meet the special needs of the shipping public, has less effect upon the equilibrium of the market place than a common carrier. The difference is re-

flected in the disparate statutory requirements that a contract carrier need only show issuance of a permit is "in the public interest"; whereas a common carrier must show public necessity and convenience requires the issuance of the certificate.

*Dupre Transport, Inc. v. Public Serv. Comm'n*, 556 So.2d 588, 591 (La.1990).

I can conceive of no reason to depart from the standard of "specialized need" in this case, even though here we are dealing with a common carrier, because TWX is for all practical purposes operating as a contract carrier. To ignore this fact, and rigidly apply the requirements properly imposed on "true" common carriers such as those in *Morey I* and *Morey II*, is not only to elevate form over substance, but entails the application of legal requirements that are devoid of any reasonable justification in this context.

Requiring a showing of "broad public need for transportation service" in the context of a single-shipper certificate is unjustifiable. How, for example, is Target supposed to show a broad public need for TWX's application? Counsel for the PUC argued before this court that the only way he could foresee Target establishing such a need would be for it to round up members of the public, explain its enterprise to them, explain why it sought a single, dedicated, just-in-time carrier, and attempt to persuade them that such transportation services are in their interest. If Target could accomplish this, then it would simply have to persuade those persons to appear before the ALJ and PUC to testify as to how the sought after application was in their interest. In my judgment, imposing such a burden on a carrier and its sole customer is unjustifiably onerous at best, at worst, it is flatly absurd.

More importantly, however, is the fact that under the circumstances presented here, I cannot imagine any reasonable or justifiable governmental interest in denying this application on the grounds that public need has

---

**3.** The intervenors hold common-carrier certificates although they are permitted to serve only Target with those certificates and TWX holds no less than eleven common-carrier certificates, all of which permit it to provide services only to specified individual shippers.

not been demonstrated.[4] The majority correctly notes that in granting a common-carrier certificate, the public need is the primary consideration, though a showing of destructive or excessive competition may require the denial of an application. Maj. op. at 357. The ALJ and PUC specifically found that there was no showing of destructive or excessive competition if TWX's application were granted. Furthermore, both found that the harm caused to competing carriers if the application were granted did not justify denying the application. The sole reason for its denial was the lack of a showing of broad public need for transportation services. If Target and TWX testify to the benefits each would enjoy as a result of granting the application, no evidence of harm to the public is introduced, and harm to TWX's competitors is deemed irrelevant, what interest is benefitted by a denial of the application? One need not reach far to conclude that the government has no justifiable interest in refusing to grant such an application.[5] In fact, the General Assembly has recognized the point by expressing its intention not to require a showing of broad public need in the context of contract carrier certification. Because the common carrier certification held by TWX is the functional equivalent of a contract carrier certificate, the legislature's intention with respect to contract carriers is equally applicable here.

In *Kuboske v. Public Util. Comm'n*, 187 Colo. 38, 528 P.2d 248 (1974), we held that the PUC may not arbitrarily limit the basis upon which public need is established. Because the government has no interest in denying a common-carrier application when no harm is caused to the public or the appli-cant's competitors, and the carrier and its sole customer testify as to their need for the application, denying the application on the grounds that a broad public need has not been established is, in my judgment, arbitrary and capricious.

### III

Though I conclude the majority has applied the wrong legal standard, and that based on the appropriate legal standard TWX's application should have been granted, I am compelled to address the evidence relied on by the majority in support of its conclusion that the application should have been denied because public need was not established. The majority relies on four facts in support of that conclusion. First, the majority places considerable emphasis on the question of whether Target's customer's will receive the benefits of any transportation savings that may result from granting the application. In this regard, it should be noted that the ALJ and PUC did not, as the majority contends, find that if TWX's application were granted, "the claimed public need for lower prices would not be met by granting TWX's application" because there are no costs savings to be had by Target as a result of granting the application. Maj. op. at 357. The ALJ and PUC never concluded that granting the application would have no bearing on the cost to consumers of Target's goods nor that Target would not enjoy any savings as result of the proposed carrier services. Rather, both tribunals simply concluded that any eventual cost-savings which Target could pass on to its customers did not "equate[ ] with a public need for the service

---

4. In his dissenting opinion to the PUC's order, Commissioner Nakarado made the point cogently:

   [W]ho is the commission "protecting" from the ravages of competition? The answer is, if anyone (note, that the Administrative Law Judge held that no one would be harmed) TWX's competitors, Intervenors Star, Platte Valley, and HVH, not Target Stores, TWX, or the consuming public. The result in this case will force Target Stores to abandon the "just in time" inventory system due to Colorado's intrastate trucking regulation by this commission, or to escape the Colorado PUC entirely by establishing its own fleet of trucks as Wal–Mart

   has done. I do not believe this result could be shown to "benefit" the public nor should be how we identify "regulated competition."

5. Again, Commissioner Nakarado makes the point forcefully:

   I would let the marketplace work. Under true "regulated competition," if this application were granted, Target would be able to choose among the services of Intervenors and TWX, and the trucking companies would compete among themselves. TWX would not necessarily win all of Target's business. The market, not this commission, would determine the winner.

here proposed" because the "public need in issue in this proceeding is the broad public need for transportation services, rather than Target's preference for a dedicated, tailored, specialized transportation service, *which may provide transportation costs savings to Target.*" (Emphasis added).

More importantly, however, is that in my judgment, if Target concludes that its enterprise will be more economically efficient and its business more competitive as a result of the proposed services, this goes a long way to establish public need. Indeed, if Target would have testified that any savings enjoyed as a result of granting the application will not impact the prices of its products, but will be paid to its shareholders, used for additional advertising, for remodeling its stores, or for any other business outlay, I would conclude that such is in the public interest. In the broadest economic sense, any action which enhances Target's competitiveness and efficiency is commensurate with the public need.

Second, the majority states that the denial of TWX's application is justified, in part, based on the PUC's finding that denying this application is in the broad public interest because doing so would result in fuel conservation and pollution savings. The record does not support this conclusion. The only testimony bearing on the question of fuel efficiency and pollution levels is the statement of Harley Morey, president of Star, who said that if TWX's application were granted and TWX awarded sole carrier authority for Target's goods leaving Pueblo, then "we're going to see more trucks on the road, more fossil fuel used to carry more empty miles with trucks."

However Morey presented no empirical evidence to support this claim. He did not explain how much backhaul traffic would be lost if TWX's application was granted, whether the lost backhaul traffic could be replaced

with the business of other shippers, how much actual traffic there is among the shippers involved in this proceeding, and the extent to which that traffic would be increased were TWX's application granted. As such, I conclude that the PUC's statement relating to fuel efficiency and pollution levels is simply not supported by substantial evidence in the record.

Moreover, the unsupported testimony of Morey seems at odds with the testimony of Target and TWX that if a single, dedicated carrier could be had, transportation savings would accrue to Target in part because multiple trailers could be hauled by a single truck, and dropped off at different locations. Thus, if TWX could haul two trailers at once, one which would be dropped off at one of TWX's existing Target locations and the other at a location served by a different carrier, it is possible that even accounting for lost backhaul traffic, in the aggregate fuel would be conserved and pollution decreased because only one truck would be needed to ship to two locations. The record is, however, inadequate to either support or contradict such speculation.

Third, the majority correctly notes that the "adequacy, availability, and competitive character of existing services are proper factors to consider in concluding that TWX's service is 'not required'...." Maj. op. at 357. In noting that the ALJ found that all of Target's existing carriers provided services that exceeded Target's on-time delivery requirements however, the majority fails to recognize that the ALJ deemed this fact insufficient to warrant a denial of TWX's application.[6]

Finally, the majority attempts to bolster its conclusion that TWX's application was properly denied on the grounds that the ALJ "considered the harm to the existing carriers when determining whether there was a pub-

---

6. Based on the ALJ's finding regarding the adequacy of the existing carriers' on-time delivery service, the majority erroneously extrapolates the fact that "[b]ecause TWX could not provide more efficient service to Target as a single shipper than the other carriers, there would be no cost-savings to pass along to Target's customers." Maj. op. at 357. The ALJ and PUC never concluded that no cost-savings would result from the

application. *See supra* p. 360–361. Moreover, it is oversimplistic to conclude, as the majority apparently does, that the only way Target could save on its shipping costs would be to increase its on-time delivery percentages. The record is replete with testimony concerning the numerous benefits of a single, dedicated, just-in-time delivery system—only one facet of which concerned on-time delivery requirements.

lic need to grant TWX's application. The ALJ found that HVH and Star Motor would lose 'backhaul' traffic if the application were granted." Maj. op. at 357. The majority correctly notes that the impact of granting a common-carrier certificate on competing carriers may be relevant in deciding whether to grant an application. *Id.* What the majority fails to acknowledge is that the loss of HVH's and Star's backhaul traffic was regarded as irrelevant by both the PUC and the ALJ. As such, the potential impact on those carriers lends no support to the conclusion that this application was properly denied.

In short, the "evidence" relied on by the majority in support of its conclusion either is not evidence at all, was not found as a matter of fact by either the ALJ or the PUC, or was deemed irrelevant by those tribunals.

### IV

I would hold that an incorrect legal standard has been applied to the resolution of this matter. The application of an appropriate and justifiable standard leads to the conclusion that TWX's application should be granted based on the evidence that was presented. Thus, I would reverse the district court's judgment and remand the case to the PUC with orders to grant TWX's application.

I am authorized to say that Justice VOLLACK joins in this dissent.